UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
(Springfield Division)

| | | |
|---|---|---|
| DEBRA KATZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. |
| | ) | |
| BELVERON REAL ESTATE | ) | |
| PARTNERS LLC, WRC 1983 | ) | |
| INVESTOR LIMITED PARTNERSHIP, | ) | |
| WILDER RICHMAN CORP., | ) | |
| RICHMAN ASSET MANAGEMENT, | ) | |
| INC., AHP HOLDINGS LLC, | ) | |
| MATTHEW ORNE, GRANT SISLER, and | ) | |
| GINA DODGE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

## INTRODUCTION

1.    Plaintiff Debra Katz ("Plaintiff") brings this action for an accounting and

damages sustained as a result of being defrauded into selling her ownership interest in Falls

View Associates Limited Partnership (the "Company") at a fraction of its value.  Each of the

Defendants was, until recently, a limited partner of or otherwise affiliated with the Company,

which had been formed in 1983 to develop an affordable housing rental apartment complex

located at 132 E. Main Street in Chicopee, Massachusetts (the "Property").  The Defendants

conspired to make fraudulent misrepresentations to Ms. Katz, on which she relied in deciding to

sell her 48% interest in the Company at a substantial discount.  The misrepresentations by certain

Defendants include materially false oral and written representations and omissions concerning

1

the value of the Property, and certain Defendants also falsely told Ms. Katz that they would not agree to any sale of the Property and indeed would block efforts to sell the Property. A short time after Plaintiff sold her 48% interest to AHP Holdings LLC for $1.5 million in reliance on certain Defendants' fraudulent misstatements and omissions, however, Defendants sold the Property for nearly $11.7 million, depriving Ms. Katz of approximately $4,000,000.

## PARTIES

2.      Ms. Katz is an individual citizen of East Longmeadow, Massachusetts.

3.      Defendant Belveron Real Estate Partners, LLC is, upon information and belief, a California citizen because it is a Delaware limited liability company with a principal place of business in San Francisco, California whose members, upon information and belief, are California citizens.

4.      Defendant Wilder Richman Corporation ("Wilder Richman") is a citizen of New York because it is a New York corporation with a principal place of business in New York, New York. Upon information and belief, Wilder Richman is a tax credit syndicator for affordable housing tax credits.

5.      Defendant WRC 1983 Investor Limited Partnership ("WRC") is a New York citizen because it is a Massachusetts limited partnership with a principal office in New York, New York and Wilder Richman, a New York citizen, is its general partner.

6.      Richman Asset Management, Inc. ("Richman Asset Management") is a Delaware citizen because it is a Delaware corporation with a principal place of business in Connecticut. Upon Information and belief, Richman Asset Management is affiliated with Wilder Richman and WRC. Upon information and belief, WRC, Wilder Richman and Richman Asset Management are all controlled by non-party Richard Richman and/or his designees.

2

7.    Defendant Matthew Orne is an individual citizen of Maine.

8.    Defendant AHP Holdings LLC ("AHP") is a Maine citizen because it is a limited liability company with its principal place of business in Portland, Maine and upon information and belief, Defendant Matthew Orne, a Maine citizen, is AHP's only member.

9.    Defendant Gina Dodge is an individual who serves as an officer, agent and/or employee of WRC, Wilder Richman and Richman Asset Management.  Ms. Dodge is a resident and citizen of Connecticut.

## RELATED NON-PARTIES

10.    Non-party Falls View Associates Limited Partnership is the former owner of the Property.  The Company was a Massachusetts limited partnership but filed its certificate of cancellation with the Massachusetts Secretary of State, cancelling its registration to do business as of December 31, 2016.

11.    Non-party Paul Oldenburg is an individual citizen of Massachusetts.

## JURISDICTION AND VENUE

12.    The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as there is complete diversity of citizenship between the parties and the amount in dispute exceeds $75,000.

13.    The Court has personal jurisdiction over Defendants under M.G.L. c. 223A, § 3 because they each conduct business in the Commonwealth of Massachusetts.  Moreover, they each have committed tortious acts in Massachusetts.  Finally, until recently, WRC, AHP and, upon information and belief, Belveron, had ownership interests in the Company, the sole asset of which was the Property located in Chicopee, MA.

3

14.    Venue is proper in this Division of this District under 28 U.S.C. §§ 1391(b)(2) or (3) and Local Rule 40.1 in that: (i) a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District; (ii) the Defendants are subject to personal jurisdiction in this District; and (iii) Plaintiff resides in this Division of this District.

## FACTS

### Background of the Company

15.    On or about May 2, 1983, Plaintiff's parents, Alfred J. Katz ("Mr. Katz") and Iris Katz ("Mrs. Katz") formed the Company and were the sole signatories on the Company's Limited Partnership Agreement. Mr. Katz was the original general partner of the Company and Mr. and Mrs. Katz were its original limited partners.

16.    The Company had a stated purpose of "the acquisition, construction and operation of a 130-unit apartment complex . . . in the City of Chicopee, Massachusetts as a moderate and low income housing project with permanent financing provided by the Massachusetts Housing Finance Agency."

17.    On or about July 1, 1983, Mr. and Mrs. Katz entered an Amended and Restated Agreement of the Falls View Associates Limited Partnership (the "Partnership Agreement") with WRC.

18.    Pursuant to the Partnership Agreement, Mr. Katz continued as a general partner in the Company, Mrs. Katz was no longer a limited partner in the Company, and WRC became the sole limited partner. Mr. Katz held 49% of the company and WRC became a 51% owner of the Company.

19.    The Partnership Agreement provided that 99% of profits and losses, other than those arising from a sale of the Company's assets, shall be allocated to the limited partner and

1% to the general partner.   Therefore, except for his general partner allowance and 1% of cash flows, Mr. Katz did not benefit from regular cash flow distributions from the Company in a share equal to his 49% ownership interest.  The primary financial benefit for Mr. Katz would be recognized only upon a sale of the Company's assets, upon which he would receive a distribution in proportion to his ownership interest.

20.     The Partnership Agreement prohibited the transfer or assignment of any limited partnership interest, other than in circumstances of death or incompetency of a partner, without the permission of the General Partner, "the giving or withholding of which is exclusively within the General Partner's discretion."

21.     The Partnership Agreement further provided that upon death of the General Partner (then Mr. Katz), the General Partner's Partnership Interest would vest in the General Partner's heirs, who would then have a "Special Limited Partnership" interest.

22.     The Partnership Agreement required the Company to hire non-party Wilder Richman Management Corporation as its investor service agent to provide quarterly progress, status and financial reports on the Company to the Company's partners in exchange for an "Investor Service Fee" amounting to 1% of the Property's gross rents.

23.     Upon information and belief, at some point prior to 2013, Richman Asset Management succeeded Wilder Richman Management Corporation as the Company's investor service agent.

24.     On or about June 22, 1983, the Company obtained a construction loan from the Massachusetts Housing Finance Agency ("Mass Housing") in the amount of $5,934,302.  In 1990, Mass Housing loaned the Company another $125,635.  The maturity date for both loans was August 2014.

**Structure of the Company's Ownership and Governance after Mr. Katz's Death**

25.    Pursuant to the Partnership Agreement, as General Partner, Mr. Katz managed the Company in his sole discretion.

26.    Plaintiff herself has extensive experience in the affordable housing industry, gained in part by working as a general partner, property manager, and owner of several other affordable housing complexes formerly owned by her father.  Indeed, she worked closely with her father managing the Property.

27.    Mr. Katz passed away in July 2000.  When he died, Plaintiff expected to be appointed the general partner of the Company because, by then, she had gained substantial experience in the affordable housing industry in the Greater Springfield community and familiarity with the Property.  WRC, however, appointed another individual, non-party Paul Oldenburg, as the Company's successor general partner and, per the terms of the Partnership Agreement, awarded Mr. Oldenburg 1% of the Company out of Mr. Katz's 49% interest.

28.    Plaintiff inherited the other 48% interest from Mr. Katz and pursuant to the Partnership Agreement became a "Special Limited Partner."

29.    As a Special Limited Partner, the Plaintiff had no right at all to cash flow distributions from the Company, as the 1% cash flow to Mr. Katz ceased upon his death and transferred to Mr. Oldenburg as the successor general partner.

30.    The Partnership Agreement provided that the Partnership shall continue until 2043, unless other events happened earlier, including a voluntary election to dissolve the limited partnership or sale of substantially all of the Company's assets.

31.    Accordingly, unless the Company were to sell the Property, Ms. Katz received no benefits from her inherited ownership interest in the Company.

32.    The structure of the Partnership Agreement – in terms of its strict restrictions on transfer of ownership interest and absence of pro rata cash flow or distributions to minority owners – was not unique within the affordable housing industry.  The industry, in fact, is characterized by limited partnership arrangements, launched in the 1970s and 1980s, which have tight restrictions against transferability, assignability, and receipt of cash flow or other distributions to minority partners.  Frequently, the limited partnership interests are transferred only by inheritance and the heirs' only opportunity to realize any gain from the ownership interest is through a liquidity event such as a sale of the property or a refinance of debt secured by the property.  In addition to the requirements of its Partnership Agreement, the Company was subject to the regulations of state and local agencies concerning, among other things, rent rates and profit limitations.

33.    It is standard practice for an affordable housing development, particularly one with multiple limited partners who have held limited partnerships for decades, to look to create a liquidity event for a partnership's partners in the form of a refinance or sale of the partnership's real property, particularly upon satisfaction of any mortgage debt and/or upon completion of the partnership's obligations under its federal and/or state affordable housing contract.  By the time the loan on the affordable housing project is paid off, the company's partners generally have realized in full any tax advantages possible from investing in an affordable housing partnership.

34.    Accordingly, within the regulated affordable housing industry a market has developed to provide early liquidity to those holding limited and general partnership interests in decades-old affordable housing partnerships.  The offers to purchase the interests are typically made at a substantial discount to account for the restrictions against transferability of the interests and nature of the minority shares.  Many limited partners, who inherited their interests,

7

do not even know they own a stake in the partnership and look upon such offers as "found money."

35.     After purchasing limited partnership interests at bargain basement prices, these companies then seek to buy out the remaining interest or force a buyout of their accumulated interest.

36.     Upon information and belief, Belveron and AHP, and their affiliated entities, are members of that segment of the affordable housing industry. See, e.g., http://belveron.com (touting Belveron's efforts at "provid[ing] meaningful liquidity to thousands of limited and general partners" of low income and workforce housing properties).

**Belveron's Ownership Interest in the Company and Role as Its *De Facto* General Partner**

37.     At some point prior to 2014, upon information and belief, Belveron acquired a direct or indirect ownership interest in the Company sufficient to allow it – rather than WRC, Wilder Richman, Richman Asset Management or Mr. Oldenburg – to dictate all decision-making concerning the Company and the Property and be in charge of approving any and all sales of limited partnership interests in the Company.

38.     Despite inquiries made by Plaintiff, neither Belveron, Sisler, WRC, Wilder Richman, Gina Dodge, or Richman Asset Management have provided Ms. Katz with any information as to the timing or manner in which Belveron acquired an ownership interest in the Company, the size of the share in the Company purchased by Belveron, or the price paid by Belveron for any such acquisition.

39.     Upon information and belief, until the time the Company was dissolved in 2016, WRC continued to hold some ownership interest in the Company.

40.    Once Belveron acquired its interest in the Company, Mr. Oldenburg no longer made any material decisions concerning the Company and acted as "General Partner" in name only.  Rather, Belveron acted in all relevant respects as the *de facto* general partner and controlling decision-maker concerning the Property and the Company.

**The Company Completes its HUD Contract and Prepares to Pay off its Mass Housing Loan, Setting the Stage for a Lucrative Sale**

41.    In early 2013, the Company's "Housing Assistance Payments" contract that it had entered with the U.S. Department of Housing and Urban Development ("HUD"), terminated. Accordingly, thereafter, the Property could be rented and/or sold, unencumbered by any affordable housing restrictions or corresponding regulations.

42.    The Company was on track, furthermore, to pay off its Mass Housing loans by mid-2014.

43.    The Property was an enormously successful project, generating over $1.8 million in rents in the year 2013 alone.

44.    With its affordable housing restrictions lifted and the prospect of imminent discharge of its mortgage on the Property, based on her own experience in the affordable housing industry and general knowledge in the industry, Ms. Katz fully expected that the Company would begin preparations to sell the Property or, at a minimum, re-finance the Property in order to allow some unrestricted liquidity to flow to the Company's owners.

45.    After her family had held its ownership interest in the Company for over 30 years with no cash distributions after 2000 and only a *de minimus*, 1%, cash distribution rate prior thereto, Ms. Katz desired to sell the Property or at least liquidate her ownership interest in the Company at the highest possible price.

9

46.    Based upon her experience in the affordable housing industry generally and specifically as a general partner of other affordable housing complexes nearby, but without the benefit at that time of any appraisal of the Property or good insight into its financial operations, in mid-2014 Ms. Katz estimated that the value of the Property was at least $7 million and that it could be readily sold to a developer who would turn the units into market-rate units or redevelop the site.

**Defendants' Materially False Statements and Omissions**

47.    On June 10, 2013, Gina Dodge of Richman Asset Management, in its role as investor service agent for the Company, sent a letter to the investors of WRC.  Ms. Dodge did not provide Ms. Katz with a copy of this letter until April of 2014.  In the letter, Ms. Dodge stated that:

- the [Property's Affordable Housing Contract with HUD ("HAP")] had been renewed [with] a rent reduction [of] approximately $23,000 per month;

- until the [mortgage] loan is paid off the [P]roperty is running an operating deficit;

- the local general partner is exploring refinancing options, as well as looking at possible exit strategies for the limited partners.

48.    The letter made no mention of any possibility of or option to sell the entire Property at the end of the HAP contract or once the mortgage was fully paid, the value of the Property, or any imminent appraisal of the Property.

49.    At the same time that Richman Asset Management sent the June 10 letter to the investors of WRC and to Ms. Katz, Belveron was courting WRC's limited partners and Ms. Katz in an effort to urge them to sell their shares of the Company to Belveron.

50.    Ms. Katz learned in late November 2014 that the statement in Ms. Dodge's June 2013 letter the Property is running at an "operating deficit" prior to repayment of the mortgage

was not true. In fact, the Property made nearly $500,000 in net income in 2013 alone. Further, Ms. Dodge's statement that the Company had, by June 2013, already renewed its contract with HUD was also false; Ms. Katz learned in August 2017 that the Property did not renew its HUD contract until December 2013.

51.     Between the time she received Ms. Dodge's letter in April 2014 and November 2014, Ms. Katz was concerned about the Company's management decisions as potentially contrary to her best interests and the Company's best interests. It made no good business sense, in her opinion based on her experience in the industry, for the Company to enter another HUD contract and continue being subject to HUD and Mass Housing affordable housing regulations. Nor did it make any sense to hold on to the Property once the mortgage was fully repaid in August 2014.

52.     Accordingly, over the course of 2014, Ms. Katz repeatedly asked Gina Dodge, Mr. Oldenburg, and Grant Sisler of Belveron about any plans to sell or refinance the Property. Ms. Katz also questioned them about the decision to renew the HUD affordable housing contract and probed for information about their reasons therefor. In addition, Ms. Katz repeatedly requested copies of any appraisals of the Property.

53.     Upon information and belief, by mid-2014, Ms. Dodge had engaged Marcus & Millichap, a commercial real estate brokerage firm, to perform an appraisal of the Property and indeed had received Marcus & Millichap's appraisal. Ms. Dodge, however, refused to provide Ms. Katz with a copy of the appraisal. Rather, she provided Ms. Katz with short-form appraisals of similar but substantially less valuable properties, and provided Ms. Katz with a short form of the appraisal of the Property that listed no price but instead solicited "requests for offers."

54.     In mid-2014, Mr. Sisler of Belveron initiated contact with Ms. Katz about the Property.  During that telephone call, Ms. Katz asked him about any efforts to sell the Property or initiate new financing for the Property.

55.     Rather than respond to those inquiries, Belveron probed Ms. Katz about the possibility of Belveron purchasing Ms. Katz's share of the Company for a price far below its value.

56.     For example, in a November 5, 2014 email, Mr. Sisler stated to Ms. Katz that "the most we can pay for [Ms. Katz's 48% share of] this property is the $1.2M." He further stated "[t]his is a large risk for Belveron given that IF the property refinances we make between $70k and $1M for your interest. . . [a]fter that, we receive nothing unless the property sells."

57.     Moreover, Mr. Sisler stated in that same e-mail "I know you think the property is worth $7M, but that number is not attainable . . . at the best case, the property is worth $6.25M."

58.     Nevertheless, Plaintiff rejected Mr. Sisler's offer to purchase her interest in the Company for $1.2 million.

59.     In another November 5, 2014 e-mail, Mr. Sisler stated that "Belveron has no plans to sell the [P]roperty and *will block attempts to sell the [P]roperty*." (emphasis added).

60.     In another November 5, 2014 e-mail, Mr. Sisler told Ms. Katz "Belveron has no intentions of selling the [P]roperty."

61.     Curiously, Mr. Sisler copied Matthew Orne on his November 5, 2014 email to Ms. Katz.

62.     Mr. Orne is the sole member of Defendant AHP, another company that works in the affordable housing "secondary market."

63.    Upon information and belief, Defendants Sisler, Belveron, Orne, and AHP are well acquainted.  Upon information and belief, Belveron and AHP, or their respective affiliated entities, have had many friendly business dealings with one another.  Since at least 2011, Belveron and AHP have been limited partners, or assignees of ownership interests of limited partners, of another non-party entity, Trinity Housing Associates, which is upon information and belief the owner of an affordable housing complex in Brockton, Massachusetts.  Belveron, Orne and AHP have also had prior real estate business dealings with a common acquaintance, non-party Christopher Bowden, in Maine and Massachusetts.

64.    Ms. Katz did not know Mr. Orne at the time she received this email.  She was not pleased with Mr. Sisler bringing a party previously unaffiliated (to her knowledge) with the Company into a private discussion of the value of her ownership interest in the Company.  Mr. Sisler explained his inclusion of Mr. Orne by stating "I have cc'd Matt on this e-mail in case he's interested in purchasing your interest."

65.    In yet another email later that same day, November 5, 2014, Mr. Sisler stated:

One more thought that I had from our conversation and your pricing.  If the property refinances, there will be $5M of new debt on the property.  You will receive, best case scenario $1M from that refinance.  IF we then decided to sell the property at a later date, (which I have mentioned previously, we have no desire to do) there is $5M of debt on the property.  At the current price of $6.25M, after closing costs, you would receive $480k.  Which means even if the property sells for $6.25M, the most that your interest would be worth is $1M+$480k, or $1.48M.

66.    At the time she received Mr. Sisler's November 5, 2014 email, Ms. Katz had not received any financial statements from Richman Asset Management, the Company's investor service agent that it paid to provide such statements, for well over a year.  Her calls and requests to Ms. Dodge and Mr. Oldenburg earlier in 2014 for financial information had gone unanswered.  She had no way of verifying the information in Mr. Sisler's e-mail.

67.     On November 6, 2014, Mr. Orne contacted Ms. Katz by telephone. He stated that he wanted to improve upon Mr. Sisler's offer of $1.2 million and would purchase Ms. Katz's interest for $1.5 million.

68.     Accordingly, based on those misrepresentations and omissions, upon which Ms. Katz reasonably relied, and after she was informed on November 12, 2014 by Mr. Oldenburg that "the guys in California put a hold" on any refinance of the Property," the Plaintiff reasonably determined that she had no likelihood of realizing any benefit from any liquidity event of the Company anytime in the foreseeable (10+ year) future. Mr. Sisler had told her in unwavering terms that Belveron refused to sell the Property, and, in light of Belveron's role as *de facto* general partner for the Company with veto power over the divestiture of limited partnership shares, Ms. Katz reasonably believed that her interest in the Company would not be able to be liquidated for the price she felt fair.

69.     Upon information and belief, Mr. Sisler's foregoing communications with Ms. Katz were knowing misrepresentations of the Property's value. Furthermore, Belveron's refusal, as *de facto* general partner, to permit the Property to be sold was also a knowing misrepresentation. These knowingly false misrepresentations intentionally portrayed the value of Ms. Katz's interest in the Company at less than one-third its actual value. When he made the misrepresentations, Mr. Sisler was fully aware of the true value of Ms. Katz's ownership interest and intended to convince her to sell her ownership interest in the Company at an artificially low price to one of the Defendants, with which Belveron had prior dealings and expected to do more business going forward. In this same time frame, Belveron was also pressuring Ms. Katz to sell her shares in other affordable housing partnerships.

14

70.    Upon information and belief, Mr. Sisler and Mr. Orne had hatched a plan to work together to convince Ms. Katz to sell one of them her ownership interest in the Company by repeatedly misrepresenting to her that (i) her ownership interest was worth much less than she believed it to be worth, and (ii) there was no chance she would experience any liquidity event to realize any gain on her ownership interest at any point in the remotely foreseeable future.

71.    Upon information and belief, at the time that the Defendants told Ms. Katz that they had no interest in selling the Property, or would "block efforts" to sell the Property, they were working together to assemble all of the ownership interest in the Company and sell the Property at a maximum possible profit for themselves, at Ms. Katz's expense.

## Ms. Katz's Sale of Her Ownership Interest at an Artificially Low Price in Reliance on Defendants' Misstatements

72.    Faced with the prospect of remaining indefinitely a "Special Limited Partner" of the Company – which Defendants had informed Ms. Katz was running at a deficit and which was not going to sell its principal asset – with no income stream at all from that ownership interest, on December 17, 2014, Ms. Katz entered a formal agreement with AHP to sell her partnership interest in the Company for $1.5 million.

73.    On January 1, 2015, Plaintiff and AHP executed an agreement entitled "Transfer of Economic Rights," effectively selling Ms. Katz's interest in the Company to AHP for $1.5 million.

74.    The Defendants knew – at the time Ms. Katz sold her 48% ownership interest in the Company to AHP for $1.5 million in January 2015 – that the Company was worth many multiples more than $3 million.  Additionally, upon information and belief, Defendants intended at the time to sell the Property at a price that would have yielded Ms. Katz many multiples of the AHP purchase price had she known the Defendants' true intentions.

15

**Immediately after Ms. Katz Sells her 48% Ownership Interest to AHP, Defendants Market the Property for Sale for over $11 Million**

75.     Shortly after Ms. Katz sold her 48% ownership interest in the Property to AHP, she received a telephone call from a real estate broker at Marcus & Millichap informing her that the Property was for sale for $11 million.  The real estate broker asked Ms. Katz if she might be interested in purchasing the Property.

76.     On or about August 2, 2016, the Company sold the Property to non-party "She's Your Queen to Be LLC," a California limited liability company, for $11,700,000.  Ms. Katz learned of the sale by a publication in the local newspaper.

77.     Belveron and AHP, who on information and belief had past business dealings with one another and expected to do more business together, mutually benefitted from Ms. Katz's discounted sale of her ownership interest.

**COUNT I**
**(Fraud – Richman Asset Management, Dodge, Belveron, and Sisler)**

78.     Plaintiff repeats and incorporates by reference the allegations from each of the foregoing paragraphs as if fully set forth herein.

79.     As set forth herein, Sisler, Dodge, Belveron, WRC and Richman Asset Management (the "Fraud Defendants") fraudulently misrepresented the financial condition of the Company, the value of Ms. Katz's interest in the Company, the likelihood of the sale of the Property, and the partners' interest in selling the Property.  Furthermore, Fraud Defendants failed after due inquiry by the Plaintiff to inform the Plaintiff as to the true status of their plans to sell the Property, the true financial status of the Company, and the actual value of the Property.

80.     The Fraud Defendants made these knowingly false statements for the purpose of inducing Plaintiff to sell her interest in the Company at an artificially low price so that certain

Defendants – all affiliates or co-conspirators of the Fraud Defendants – and not the Plaintiff, would benefit from the sale of the Property for $11.7 million.

81.    Plaintiff relied on the Fraud Defendants' misrepresentations and material omissions when deciding to sell her interest in the Company at an artificially low price.

82.    Plaintiff reasonably relied upon the Fraud Defendants' misrepresentations as each of them had financial information concerning the Property and Company and information concerning their true desire to sell the Property to which the Plaintiff did not have ready access. Furthermore, due to the status of Belveron as *de facto* general partner of the Company, and Richman Asset Management as the investor service agent, Plaintiff reasonably believed that the Frand Defendants had access to accurate information – and in fact decision-making power – as to the Company's plans to sell the Property.

83.    The Plaintiff has been harmed by the Fraud Defendants' conduct.

## COUNT II
### (Civil Conspiracy – All Defendants)

84.    Plaintiff repeats and incorporates by reference the allegations from each of the foregoing paragraphs as if fully set forth herein.

85.    The Defendants entered into an agreement to commit an unlawful act; namely, to misrepresent the financial status of the Company, the value of the Property, the Company's plan to sell the Property and the value of the Plaintiff's interest in the Company to the Plaintiff so that they could collude to amass 100% of the ownership interests in the Company and sell the Property at the highest possible price, with the profits therefrom flowing to themselves and their affiliates rather than to the Plaintiff.

86.    Each of the Defendants substantially assisted in performing this conspiracy by, inter alia, performing the acts described above including but not limited to failing to disclose to

the Plaintiff the nature and extent of each of the Defendants' interests in the Company, retaining an appraiser to value the Property and then failing to disclose that appraiser's report to the Plaintiff, misrepresenting to the Plaintiff that the value of the Company and the Property and Plaintiff's interest in it, failing to regularly provide accurate financial information concerning the Property, misrepresenting to the Plaintiff that the Company had agreed to a new contract with HUD, decreasing its rent rolls by $280,000 per year, and misrepresenting to the Plaintiff that the Defendants had no interest in (and indeed would take efforts to block) selling the Property.

87.     As set forth above, Belveron, Sisler, AHP and Orne also undertook conduct designed to exercise power of coercion over the Plaintiff to convince her to sell her ownership interest in the Company under the false belief that it was worth $1.5 million and had no possibility of divestiture other than to AHP.

88.     Plaintiff has been damaged as a result of the Defendants' unlawful conduct.

## COUNT III
**(Breach of Fiduciary Duty – Belveron, Sisler, and Richman Asset Management)**

89.     Plaintiff repeats and incorporates by reference the allegations from each of the foregoing paragraphs as if fully set forth herein.

90.     As the actual or *de facto* general manager and/or general partner of the Company, with the right to control all material management decisions of the Company, Defendants Belveron and Sisler owed a fiduciary duty of utmost good faith, care and loyalty to Plaintiff.

91.     Belveron and Sisler breached their duty by operating the Company for their own financial self-interest and that of their ally AHP, including but not limited to defrauding Plaintiff out of her 48% interest in the Company at an artificially low price, engaging in conduct that benefitted Belveron and AHP to Plaintiff's detriment, by misrepresenting that the Company was not going to be sold or its loan refinanced, by working to purchase Ms. Katz's share for

18

themselves for a price far below its value, and by otherwise putting their self-interests above that of their fellow limited partners.

92.    Upon information and belief, Richman Asset Management was appointed as the "investor service agent" for the Company and as such also owed a fiduciary duty to its partners.

93.    Richman Asset Management breached that duty by falsely portraying the Company as in poor financial condition, by, inter alia, informing the Plaintiff that the Property was running at an "operating deficit," had entered a renewed, detrimental contract with HUD, and informing the Plaintiff that her share of the Company was not likely to become liquid because there was no intention to refinance or sell the Company.

94.    Plaintiff was and continues to be damaged by Defendants' conduct.

### COUNT IV
### (Demand for Accounting – Belveron, WRC, Wilder Richman, and Richman Asset Management)

95.    Plaintiff repeats and incorporates by reference the allegations from each of the foregoing paragraphs as if fully set forth herein.

96.    Plaintiff was a limited partner in the Company, with a right to demand an inspection of and receive a full accounting of the Company's finances.

97.    Upon information and belief, Belveron, WRC, Wilder Richman and/or Richman Asset Management are in sole control of financial statements for the Company.

98.    Plaintiff is entitled to receive an immediate full accounting of the Company's financial condition from 2000, the time at which the Plaintiff's father ceased being the Company's general partner, until the end of 2016 when the partnership dissolved.

## COUNT V
### (Unjust Enrichment – AHP, Orne, Sisler, Belveron, and WRC)

99.    Plaintiff repeats and incorporates by reference the allegations from each of the foregoing paragraphs as if fully set forth herein.

100.    Plaintiff communicated numerous times with Sisler, Dodge, Richman Asset Management, Belveron and Wilder Richman in order to make an informed determination as to the value of her interest in the Company.

101.    Each time, as set forth above, those Defendants misrepresented or omitted material facts to the Plaintiff and knowingly withheld an actual appraised value of the Property from the Plaintiff, as detailed herein.

102.    Defendants worked together to lead Plaintiff to believe that she had no choice but to divest herself from her ownership interest in the Company for $1.5 million.  When she sold her ownership interest to AHP, the Defendants achieved 100% control of the Company, allowing them immediately to turn around and market the Property for a value approximately 3.5 times the value of the Property that they had misrepresented to the Plaintiff.

103.    Plaintiff received, therefore, approximately 27% of the value for her share of the Company that she should have received had the Defendants held an arms' length sale of the Property while she was still owner of 48% of the Company, as they completed just 18 months after Plaintiff sold her interest and as is customary in the industry upon payment of the mortgage loan on the Property..

104.    Plaintiff has been harmed by the Defendants' conduct.

105.    AHP benefitted at the Plaintiff's expense from purchasing her interest at an substantially discounted price only to receive a windfall, of approximately nearly four times the

amount paid for the interest just 18 months prior.  It would be unjust and inequitable to permit AHP to retain its unjust enrichment at Plaintiff's expense.

106.   To the extent that AHP distributed or shared its unlawful windfall to the other owners of the Company, each of those owners have also been unjustly enriched at the Plaintiff's expense.

## COUNT VI
### (Tortious Interference with Contract – AHP, Orne, Sisler and Belveron)

107.   Plaintiff repeats and incorporates by reference the allegations from each of the foregoing paragraphs as if fully set forth herein.

108.   Defendants AHP, Orne Sisler and Belveron, at all times relevant hereto, were fully aware of the Plaintiff's role as a limited partner of the Company and the contractual rights and obligations imposed upon her by the Partnership Agreement.

109.   Upon information and belief, neither AHP, Orne, Sisler nor Belveron were parties to the Partnership Agreement at the time the Plaintiff was also party to that agreement.

110.   As described herein, Defendants AHP, Orne, Sisler and Belveron, with improper means or motive, deprived Ms. Katz of the full value and enjoyment and benefit of her 48% interest in the Company.

111.   As a result of Defendant's interference, Plaintiff has been damaged.

## COUNT VII
### (Violation of M.G.L. c. 93A Section 11 – AHP, Orne, and Richman Asset Management)

112.   Plaintiff repeats and incorporates by reference the allegations from each of the foregoing paragraphs as if fully set forth herein.

113.   Plaintiff, AHP, Orne and Richman Asset Management are engaged in trade or commerce and entered into a business transaction with each other.  Namely AHP and Orne

entered into a transaction with Ms. Katz to sell purchase the Plaintiff's 48% interest in the Company. Richman Asset Management served as the investor service agent for the limited partners of the Company, including Ms. Katz.

114.    Neither AHP, Orne, nor Richman Asset Management were Company partners in the Company while Ms. Katz was an owner of the Company.

115.    AHP's and Orne's conduct, in: (1) purchasing Plaintiff's 48% share of the Company for $1.5 million, while being fully aware that the value of such interest was many times that amount and that the *de facto* general partner intended imminently to sell the Property; (2) depriving the Plaintiff of that same information; and then (3) reaping the benefit of the full value of that 48% share a mere 18 months later, constitutes an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two of M.G.L. c. 93A.

116.    Richman Asset Management's conduct, in misrepresenting the financial state of the company and misrepresenting the status of the Falls View contract with HUD, which were done in order to convince Ms. Katz (and presumably other limited partners) of a lack liquidity in and value of her 48% interest in the Company, constitutes an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two of M.G.L. c. 93A.

117.    AHP's, Orne's and Richman Asset Management's willful and/or knowing unfair and deceptive actions occurred primarily and substantially within the Commonwealth as Ms. Katz resides in the Commonwealth, the Company – 48% of which AHP purchased via unfair and deceptive methods, as set forth herein – is a Massachusetts limited partnership, and the Property that is the Company's sole asset is located in Massachusetts.

118.     As a result of AHP's, Orne's, and Richman Asset Management's violation of M.G.L c. 93A, Plaintiff has suffered a loss of money or property compensable by an award of damages in an amount to be determined at trial.

## RELIEF REQUESTED

Plaintiff respectfully requests that the Court:

(a)     Enter judgment in her favor against each of the Defendants on Counts I through VII;

(b)     Award Plaintiff her damages, including interest, costs, attorneys' fees and multiple damages pursuant to M.G.L. c. 93A;

(c)     Order Defendants to provide a full and accurate accounting; and

(d)     Award any other relief this Court deems just and equitable.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims and issues so triable.

DEBRA KATZ,

By her attorneys,

David B. Mack (BBO #631108)
dmack@ocmlaw.net
Tara J. Myslinski (BBO #644936)
tmyslinski@ocmlaw.net
**O'Connor, Carnathan and Mack, LLC**
1 Van de Graaff Dr., Suite 104
Burlington, MA 01803
T: 781-359-9000

Dated:  September    , 2017

4838-4521-9409, v.  1

23